Department of Justice. Case number 18-5331. Jeremy Pinson, assailant v. United States Department of Justice et al. Mr. Shelley, court-appointed amicus curiae for the assailant. Mr. Crockenwell for the appellee. Good morning, Mr. Shelley. You may proceed. Good morning, and may it please the court, I have reserved two minutes of my time for rebuttal. There are three issues presented in this appeal involving informal copper status. Two were outlined by the court, and a third arises depending on the answers to the first two. The questions are, first, under the PLRA, must IFP status be reassessed at the time each new complaint or appeal is filed? The answer to that is yes, but with some qualification, as I will explain. The issue is, must there be a nexus between the complaint's underlying claims and the assertions of imminent danger used to overcome the three strikes rule? The answer to that is no. There is no nexus requirement. And if the first two questions are answered against Pinson, then the third issue arises, and that is whether the denial of IFP status in her particular case is unconstitutional because she raises allegations involving fundamental rights. The answer to that is yes, if the court would have to get to that. I will go in order on these issues. So the first issue is assessing IFP status at the time of the appeal. There is threshold agreement between the government and the amicus on this. Both sides agree that the plain language of the PLRA requires the courts to reassess IFP status each time a new complaint or appeal is filed. The key case is Williams from the Ninth Circuit, really the only case who has addressed this, and it is addressed thoroughly going through the plain language of the statute. So again, there is an initial agreement between the government and amicus that IFP status should be assessed each time a new complaint is filed and each time a new appeal is filed, here being a new appeal. But that is where we run our company. The amicus asks the court to adopt the evidentiary presumption that the Ninth Circuit invoked in Williams. Here is how the presumption would work. Where a plaintiff makes a sufficient allegation of imminent danger at the district court stage, the plaintiff will be presumed to continue with that allegation to the appellate stage and meet the requirement of imminent danger at the appellate stage through the presumption. The Ninth Circuit adopted that in Williams because it makes the inquiry simple and simply administrative rather than a whole side trial about this initial privilege of whether the prisoner can obtain IFP status. The Ninth Circuit also said it avoids more instances where a potentially wrong district court decision would remain uncorrected, which would be a bad thing. The court also said there in Williams that it would avoid to a greater degree any unconstitutional applications if... I don't think it's at all inconsistent with the plain language of the statute to have a presumption system because the statute requires a factual inquiry and by requiring a factual inquiry... But if we agree with you that the court only looks at the claims of the prisoner and accepts that it's true, what's the problem? Why do you need a presumption when there would be no need to trial? The court would just look at the new allegations and based on our casework, presume those are true and make a judgment based on the allegations at the time of the conviction. Why is that a problem? Well, oftentimes the allegations both at the district court level and at the appellate level involve continuous and continuing patterns of context and therefore... But that's the question that all the prisoners have to do is re-allege. It's true. For instance, in this case, Pinson has re-alleged those. For instance, in the notice of appeal that Pinson filed, she specifically said that ISP status should be referred again on this appeal based on the ruling of this court a year earlier, which is an implicit indication of adoption of the same continuing pattern. I think if there is a great deal of time between one period at the district court level and the court of appeals, I suppose the presumption at that point would be more in question. In order to hold the presumption, the prisoner might have to say more on appeals than nothing. But I will note that in Pinson's case, in the Ninth Circuit for instance, there was a great delay between the district court level and the court of appeals level and the court did adopt a simple presumption saying, If you had the status below, you did it here. And at least here, if we start with the presumption, the record which can be substantial at the district court level can automatically be incorporated into the court of appeals level. And given that the prisoners are pro se almost all the time, lessening the burden on them on having to remake the wheel at the court of appeals level is a development that I think would be consistent with the statute. Here, the presumption is satisfied, just by reviewing the factual allegations. Can you prevail without a presumption? Yes, we can prevail without a presumption because what the court should do is determine whether Pinson was in imminent danger at the time of the appeal by looking at the whole record. The court is not limited to any specific document. The court can look at any, as Imani says, the court can look at any document that discusses the timely imminent danger that's at issue. So you could look, what Pinson has done is created a... Is it imminent? Yes, and not only was it imminent, but it occurred. It occurred, and we know that... No, it occurred, that it occurred. That's fine. But imminent means likely to occur. It doesn't mean having occurred. Is there anything that would suggest an imminent danger here? What I mean by it occurred is it occurred after the notice of appeal. So you had assaults that occurred before the notice of appeal. You had assaults that occurred after the notice of appeal. And what Pinson has stated is that starting as far back as 2008, the pattern begins. What begins is she's an informant helping the government. She's helped unionize prisoners. She's helped the government investigate rape allegations in prison. And as a result of that, over a period of time, she's become endangered within the prison system. Now, that would bring us to the question of whether you have a nexus, which I know you are taking positively directly, that there is not a nexus requirement, rather than suggesting that assuming there is a nexus requirement, is there any nexus here between the relief raid and the imminent danger allayed? Yes, there is a nexus. There is full nexus. And so Pinson meets the nexus requirement through two ways. One is the relief raid. So one of the sets of claims is to collect false information in her record that the BOP, we'll call them culprits as she puts it, are masked in the records and as a result avoid discipline. That's one set of allegations, to correct the records and add truth to the records. That's connected to the assault because the BOP isn't stopping them within the prison, because these people, the BOP individuals are never identified because the records are never corrected and are improper and actually falsified. The second set of allegations, there are first and eighth amendment claims in the amended complaint for the BOP retaliating against Pinson, pursuing the government and unionizing. Well, damages will not help imminent danger women. How does damages for price tags have a nexus to the prevention of the imminent danger, the protection against the imminent danger? Sure, damages are designed to deter. If the BOP prisoners... And damages are designed to make a hole. In addition to having the purpose of causing the individuals who pay the damage to stop doing it. Now, no case has said that the imminent danger exception applies only if the plaintiff seeks conjunctive relief, and that's what the government would have to have the statute read,  but a damages allegation for prison conditions will, I would argue, assist in stopping the prison conditions because the people causing it, the BOP, would have to pay. I see that I'm into my rebuttal time, so I... No, well, wait, we may have... Sure. We may have... Judge Montiel, did you have another question about that subject? No, I don't have any more questions. Okay. Judge Rafferty, do you have any questions about the two statutory issues? Before I ask my question about that constitutional question. Yeah, that's very good. I do have a question about the nexus requirement. I was wondering if you could help me understand how, I mean, on your view that there should not be a nexus requirement, how can you read the statute without a nexus requirement in a way that the exception for imminent danger doesn't swallow the three-step rule? So, on the face of the statute, there is no nexus requirement of statute, and Congress, as the court said, one of its, this court has said in one of its cases, thought that there would be, that most of these cases would be given prison conditions, and so I think you can assume that Congress thought there would automatically be a nexus in the cases because the imminent danger would be the prison conditions, and the claim would be about halting or getting damages for the prison conditions. So, the vast majority of cases, there would be the nexus even without it being stated in the statute. So, it doesn't swallow the rule to allow additional cases, some marginal cases that don't meet the nexus requirement into the universe. And, in fact, you can think Congress would think it would be very unworkable to put a nexus requirement in. How much nexus would there have to be? Would all the claims have to have nexus? Would there be dependent nexus for some of the claims as opposed to some of the others? And, given that Congress thought that the statute was really designed, would really be, the prisoners were really filing cases mostly about prison conditions, and you could assume an imminent danger connection in those. It really doesn't swallow the rule. So, it swallows the whole statute. I don't believe so because. If you're admitting that most of the claims are going to be about prison conditions, and if you're finding that that's sufficient to meet the first step of the nexus, then you're admitting that most of the cases are going to get passed the IFP. It doesn't swallow that whole section. Well, if there's sufficiently serious conditions, if we're talking about something very minimal, there wouldn't be any ISP status in that situation because you wouldn't be in any danger of serious bodily injury, if there's serious bodily injury. Mr. Shelley, I want to ask you about your amplified constitutional claim. So, your claim is that the rechargeable is unconstitutional, but it bars her from pursuing the first amendment, right? Correct, yes. But, this is an appeal, this is an interlocutory appeal for the denial of preliminary charges. And the claim, your clause, not your clause, the claim consists of stating that the Board of People, Managers, and Judges did not pursue or administer the denial of extra charges court, and that the Board of People, Managers, and Judges did not pursue or administer the denial of extra charges. So, from our perspective now, the first amendment, not only is the first amendment a claim, but it is a denial of preliminary charges. It's an interlocutory appeal. And there are specific substantive actions that go before the court. So, the reason I ask that question, you know, is that we can, of course, make clear in those and other cases that the rate of compensation issues, the claim is completely foreclosed. Completely foreclosed. And we can still pursue it from the line of both access to court and first amendment. The third preliminary injunction request that was denied by the district court involved Pinson's allegation that the government was denying her access to stamps, paralegals, law library, legal mail. All of those implicate the first amendment right to petition your government for grievances, which is part of the basis, I think, for the right of access to the court. And so, that issue, the first amendment issue about access to the court and the right to petition the government for grievances, is an issue in that preliminary injunction request. And Pinson would argue and argued that she can't properly access the court. She can't pursue her case, even this case, because she can't get the materials. Okay. I understand your good point. I understand it. But what about my second question? This is just an interlocutory field. In the narrative, all of you have spoken to this before. So, she hasn't been completely, as far as I'm aware, in other words, in reality, the plaintiff has, quote, still meaningfully pressed her on the line. In the third, again, the third preliminary injunction request, Pinson says she cannot. She cannot. In this case, she can't. Well, let me just, you know, I'm sorry, but all the district courts found, I think, was that she's unlikely to be detained. She still has her merits to claim in the district court, right? In other words, if she can't pursue this appeal, in fact, she brought this interlocutory appeal before she pursued the merits of her case, right? In other words, the preliminary injunction was denied. Okay, let's go on to the merits. She filed this interlocutory appeal. We rule that she can't pursue the interlocutory appeal. She still has her merits to claim in the district court. So, in other words, I'm sorry, the plaintiff has been detained. Well, she argues it is because she can't pursue the merits of the claim. Okay, let me try one more. Yes, sure. She can pursue it in the district court now because the preliminary injunction issue is out of the way. She can now pursue the merits. She can now argue in the district court that the prison, denial, stamp, access to the law, letters, library, and other things, including her pursuing her First Amendment claim, she has that issue. Why in the district court? Is that true? Yes, but she can't meaningfully pursue it because she doesn't have stamps, paralegals, law library, and legal mail. In other words, while the claim is alive in the district court and can get to the merits, her point is, I can't possibly, she doesn't have counsel, and she can't possibly present her case because she lost her preliminary injunction request. She can't file the papers. She can't present legal arguments because she has no access to the paralegal and the law library. So it's as if the claim through the preliminary injunction denial has been defeated already. And that's why she might well lose the district court, in which case she would have an appeal from the merits, and this cause would then be confronted directly with the question of whether she's been absolutely barred from pursuing her claim. Yes, and justice delayed is justice denied, she would argue. All right. Well, thank you. Sure. Judge Pintel, Judge Roth, do you have any further questions? No, I just want to give my thanks to Dan McKee for his patience. Okay. And I was actually going to thank him after the argument. I thought you were going to thank him. Yes, I could. Whenever you thank him, I'll thank him too. Yes, sir. I'll take as many as you can take. We're here for the government. Go ahead. Good morning. May it please the Court, Peter Fafnock for the government. Yes. So as Amicus was just arguing, really the core questions here are whether or not a presumption applies. He invokes the Ninth Circuit's decision in Williams and says that the presumption ought to be applied here as well because it's a, quote-unquote, simple approach. But I think that that really skirts the Court of Appeals' role and responsibility under the PLRA to ensure that, in fact, an imminent danger does exist at the time the notice of appeal has been filed. And sometimes, you know, taking the simple path is not the right path. And as I think Judge Tatel was suggesting in his questions, it is essential, and not that much to ask, frankly, for a prisoner legate to show that at the time the notice of appeal is filed, whether the person does that in order to show cause response or in the notice of appeal or some other contemporaneous filing, that, in fact, an imminent danger does exist at that time and doesn't just try to import the injury from an earlier phase. You know, furthermore, I think the most important question presented here really does relate to the nexus requirement. As Judge Santel was correctly noting, you know, without a nexus requirement, really the entire IFP process under the PLRA would be, you know, removed effectively from the statute books, because effectively the injury would not need to be shown to be remediable through the lawsuit. We've seen many, many lawsuits brought by prisoners that have nothing to do with the actual prison conditions or the imminent danger that they allege. And, in fact, to some degree, the cases that the court is considering this morning fall along those lines. So it's important that the actual nexus be required as a number of other circuits of health, some in published decisions, some in unpublished decisions. But their analysis is persuasive. Yes? If the court has any questions, I'm happy to answer them. You're welcome. How exactly would you formulate the nexus requirement? What precisely should we be looking for in terms of a nexus? I think that the Second Circuit's approach in Pettis makes the most sense. It does make sense that the analysis goes claim by claim, because you don't want to have a grab bag of claims, some of which come along for the ride, even though they have nothing to do with the imminent danger that the lawsuit, according to the PLRA's purpose and its text, ought to be remediating. So look for whether or not the injury, in fact, akin to a standing analysis, is, in fact, appropriately set forth, and then whether or not that injury, in fact, would be remediable by the claim in question. If the court has something further, I'm happy to restate our agreement. My question was, do we have to decide? I realize the question of whether the statute allows missing nexus requirements is divorced, but do we have to define the precise nature of that requirement? We don't think that there's any nexus at all. In this case, you do not need to go further, because I believe it's pretty clear in the government's view that a light nexus, a substantial nexus, there's just really no nexus between the PI issues that are before the court currently and the dangers that have been asserted by amicus, which I'll point out really are not asserted by Pinson as of the time of the filing of the notice of appeal, but rather have sort of been constructed from a variety of other records over a course of many years. That really defies the principles underlying the need that the injury be quote-unquote imminent. And looking back at filings from, as amicus noted, 2008 and forward, that really defies the term imminent. Any further questions? Mr. Shelley, we took you well over your time. You can take an extra minute if you want. Thank you, Your Honor. I'm going to use up your minutes, so I'm going to use up my own minutes. Would you respond to the last question about whether we can define a nexus, assuming there is a nexus requirement, given her, and assuming we require allegations of imminent harm at the time of the appeal? Why do we have to define the requirement? If you have a nexus requirement, I don't, you wouldn't have to define it very much because, as we said in our case, Pinson meets the nexus requirement. While my colleague says that there's no imminence because the allegations begin in 2008, in fact, what they show is a pattern that began in 2008 and continues well on beyond this case even. And so in that instance, there is. The other thing I'd like to say on nexus is, this has been avoided in nearly every case that's been reported. For instance, the Vandiver case in the Sixth Circuit avoided it because there is nexus in nearly all these cases. So insisting on looking at nexus does not mean suddenly throw into court a whole bunch of cases that otherwise weren't in the court already. Given that the statute doesn't have a nexus requirement and given the unworkability of one, for instance, the Second Circuit actually, after the case that was mentioned, held that you don't need nexus with every single claim. You only need nexus with one claim, and the other ones come along pendently. So there's a lot to determine once you bring into the statute a nexus requirement, including what should it look like. And, you know, the Second Circuit pulled out a, just drafted up one that's nowhere in the statute based on a standing requirement, and there's no indication from Congress. Well, the standing discussion was more of an analogy, actually, wasn't it? It was. She didn't say that you had to have exactly a standing. She said that there was an analogy there in causation and immediability provisions, right? Correct, but it's just one construct built on another construct that isn't in the statute in the first place. So once you delve into finding a nexus requirement, you're going to have to define what it should look like through analogies. You're going to have to define whether it's dependent, and there's not a necessity for that given the types of cases that are usually filed. So I thank the court. Thank you, Mr. Shelley. Do you want to just move right into your arguments on behalf of Marty? Marty, yes. When you're busy, you should have done this before getting back here. Okay, with the staff in hand. There are two issues in this case. The nexus issue is also present in Gorby's case, and that's the second issue. But the first issue is slightly different than the first issue in the Pinson case, and the first issue is can the court consider a prisoner's allegations raised for the first time on appeal when determining application of the human danger exception for the appeal? And, again, at the start of that issue, at the threshold, there's not dispute among the parties that the court can and should consider new allegations raised on appeal. Briefly, the statute requires the court to assess whether when appealing in the present tense, when appealing a judgment, the prisoner has three strikes, and if the prisoner is in imminent danger of serious physical injury, then he or she will be allowed to proceed and form a papyrus. The use of the present tense at both the beginning, appealing a judgment, and at the end of the imminent danger exception is an imminent danger. It indicates that the circumstances that exist at the time of the appeal are what matters. Again, the Ninth Circuit addressed this in the Williams case, the only case on point in it, and held that the facts at the time of the appeal are what matters, and it really would make no sense to disallow new facts alleged on appeal when the whole goal is to determine what are the circumstances on appeal. So there is agreement between myself and the government on the ability to consider new facts and circumstances on appeal. In fact, that's the only thing that should be considered is what are the circumstances at the time of the appeal. But then we have a series of disputes again with the government. So the first one is, again, about this presumption about should the district court, the facts at the time of the district court filing be considered on appeal. And there's really actually much ado about nothing, because Gorby in his show-cause response in the Court of Appeals repeated all the distinct facts. So you don't need to get into the presumption so much at all. Instead, you just really can look at the facts that he has alleged in his show-cause response and also in his brief in this case. Am I right? Didn't the district court in the different districts address these same claims in fines? Yes, there was. What do we do with that? Even if we accept Frisner's claims as true, what about a district court decision that was already rejected? The district court in Maryland that initially awarded Gorby in form of pauper status but later revoked it, and you should reject that court's decision because it held Gorby to too high a standard for showing imminent danger. What it did was it demanded objective medical evidence rather than just simply liberally construing his allegations of imminent danger, which is to Mitchell. The standard in this circuit under Mitchell is liberally construed allegations, and instead that court, later revoked it because he didn't come up with any objective medical evidence and instead the government started producing material that the court thought undermined Gorby's position. But this court doesn't allow the government to do that. The determination under Mitchell... No, under Ostermann and also under the... Obviously the Ninth Circuit doesn't govern here, but the Ninth Circuit addresses this point too in the Williams case. The issue is based on a liberal view of the allegations that the prisoner has presented. Is he in imminent danger of serious violence? No, that gets to the point in the first instance that's fine. But why the plan that the government must remit it to the statutes that have been proposed to me, for example, and get the status revoked? I don't understand that to be compelled by the precedent. Why is it? Well, what the statute says is that if it becomes clear that elsewhere that the prisoner is not poor, then the court can revoke and form a proper status. But it doesn't say anywhere if later the court, you know, based on additional evidence, as opposed to the lens of looking through the allegations that the plaintiff has presented, liberally construed. If later on the court finds on the merits, for instance, some evidence that undermines things, there's nothing in the statute. Does that make a lot of sense, that the court can revoke if he finds out by accident, but not if the government can't present evidence to get it there? It does. Can you imagine when Katie and Buddy say, Yes, because there are two of them. There are two of them. I think Asimane says that, and then William says it even more clearly. And the reason is because this is just a screening device at the very beginning of a case. It's to determine whether the prisoner should have the privilege of filing through installment payments as opposed to paying the whole fee. And as a result, it shouldn't be turned into a mini-trial. And you can see in this case, for instance, the amount that the government took all but one word of his word allowance in order to argue that, 13,000 words in order to argue that Gorby isn't authorized for informal pauper status. And this is after proceedings that took many months already, evidence going back and forth. And this is to determine a screening device as to whether just the case should go forward. If it's being abused and if what's really going on here is a frivolous type of claim or argument, then there are other mechanisms in the PLRA for the court to dismiss the case. It shouldn't use the administrative finding of informal pauper status to accomplish all of that. And really I think what's going on in the government's brief is they're trying to erect an evidentiary burden for informal pauper status that is completely inconsistent with this court's prior precedence. For instance, they want to put a summary judgment burden on the prisoner to show informal pauper status. They want to have a presumption against the prisoner and in favor of the government. They want to allow the government to contest the ISP allegations on the merits. They want to allow an opportunity for the appellate court to enlist the district court to develop the facts. They want to consider facts showing that the danger abated since the notice of appeal. All these elements are foreclosed by Mitchell, Asimani, and actually Pinson's earliest case, which say you look at just the allegations of imminent danger presented by the plaintiff, you liberally construe them, and you don't look to events that may have abated afterwards. Pinson specifically says that. So this very high burden that the government wants to put and that the District of Maryland actually put on Gordy, it's not consistent with this court's cases. So really what it boils down to then are the dangers that Gordy has alleged for informal pauper status. Are they imminent and sufficiently serious? And they are. There are two principal dangers. The first is the danger of being in a top bunk given his physical condition, and the second is that he's alleged ineffectively treated globally. What relief did he bring in his complaint? So the relief that Gordy wants is his claims are that he wants damages, again, to deter certain conduct. His main issue is he wants, I think he sought, $800,000 in damages against the United States for the DOP's bad act and for a conspiracy the DOP has. But that, except for your deterrence period, that does not in any way protect against the alleged imminent danger of falling out of bunking, does it? Well, it does because what Gordy has presented in his complaint are allegations against judges but also allegations against the DOP. The specific relief he's asked for is damages, but in reality the district judge knowingly giving the complaint a liberal construction and under Rule 54 actually the district judge is required to give him all of the relief he's entitled to given his allegations, even if he didn't ask for it. And given his allegations about being improperly placed in a top bunk that he shouldn't have been and given his untreated glaucoma, the court could give an injunction. He hasn't, I mean, he's not represented, he's pro se again, and he's asked for money, but there's nothing to prevent the court from giving him the injunction that would provide the close connection, I think, that Judge Suntell, you're looking for. The last thing I'd point out is that on the idea of being in a top bunk, given his physical condition, given his bad knees, his broken wrists, there are several cases we cite in our brief noting that the previous courts have held exactly this, that being in a top bunk is imminent danger. And I think those are particularly page 32 in our brief. And then on the untreated glaucoma, pages 21 through 25, 51 and 52 of our brief notes show also that those are imminent danger. So I gather my time is up. Thank you. We'll hear from the government. Good morning again. Peter Savinoff for the government. So my colleague just basically said that the court should allow the evisceration of the three strikes rule as a component of the PLRA because there are other components of the PLRA that can guard against litigation abuses by prisoners. The three strikes rule is there for a reason, and this court should give effect to all parts of the statute if possible. And adopting a construction that effectively reads the three strikes rule out of the statute would not be proper. Furthermore, I would note that although the court circuit's decision is just a line or so, it did in fact affirm the District of Maryland's rejection of all of the imminent harms that were alleged here, including specifically the analysis in the District of Maryland decision that went up on appeal focused more extensively on the top bunk assignment. What about Patrick Kelly's point that this court is much too rigorous to acquire an objective? Well, one point I'd like to make is that obviously Asamani says what it does. Asamani is in some tension, however, with the earlier decision in Mitchell. Asamani is 2015 and Mitchell is 2009. And in Mitchell, this court said it should make its IFP decisions based upon as much information as it can gather. Right, but that was about how many strikes there were, wasn't it? It was, Your Honor. Except the difference, right? Your Honor, this case demonstrates... Your Honor, treating them as true is one thing, but treating them as true when the court is also presented with evidence which shows that they are in fact not true is a different analysis. I suppose, frankly, in this appeal we've also put forward the evidence that the court asked for, or at least I inferred when we received a request for us to respond to Mr. Gorby's show-cause response. You know, we pointed this court to numerous filings that had been offered in the District of Maryland which showed that a number of his allegations were not factually accurate. So we're not only relying upon the District Court's decision itself, which I agree should be considered perhaps different than the evidence that the O.P. itself invited the court's attention to, but that evidence itself shouldn't just be ignored where the court is aware of it. The court should not countenance being abused, and the evidence here does show that this court should not turn a blind eye to the fact that Mr. Gorby is an incredibly experienced litigant who's brought countless lawsuits nationwide, and who seems to be trying out and trying to find a variety of imminent harm allegations that he can use in order to thread the three-strikes needle every time. And the fact of the matter is, I feel very sorry for Mr. Gorby that he has glaucoma, but it is not the case, as he asserts, that B.O.P. is ignoring it. His very own show-cause response offered in this proceeding says, oh, I haven't been seen by an optometric in a year, and then a month or two later he says, and I saw optometric Robert Mitcher, you know, I think this was in October 2018, which would have been a month or two before he filed the status of the deal. And he took issue with the fact that the Utilization Review Committee said he didn't need to go see an outside ophthalmologist right then, because the only question was, could they find another set of eye drops to which he would not have side effects? And, in fact, the Utilization Review Committee said, go and please meet with your primary care physician and the pharmacist, and let's see what we can do internally before you see an outside physician. Let me just ask you two questions. Yes. It sounds like, I mean, if we were to agree with you about all of this, you would have the courts getting into a little knee trial, which I think is exactly what we're supposed to do. But more importantly, at least in this case, if we agree with you there's no nexus, why do we even have to address this? I agree, Your Honor, if there's no nexus, you do not need to get into these factual problems. The court, however, is going to continue to be confronted with prisoners who are telling half-truths or untruths in order to try and thread the three-stripes needle. And if that is permitted to continue where the court is aware that a prisoner is playing fast and loose with the truth, that does a disservice to the courts and imposes the very burden on court resources that the Prison Litigation Reform Act was supposed to address. If the court has nothing further, I would ask that the decision be affirmed. Do either of you have any questions? No questions. I have a question. Okay. Mr. Shelly, you can take one minute. Thank you, Your Honor. Gorby's a prisoner who has been mistreated, and it's not surprising that he has filed many cases, and he also feels as though no one responds to his allegations, and that's the basis for his complaint. So, you know, he shouldn't be denied a form of pauper status just because of the government's view of him. His case should be determined based on what he is. ISP's data should be determined based on the allegations that existed that he made, existing at the time of the appeal, and Mitchell says exactly this. It says to construe his allegations liberally in his favor as true. In fact, Mitchell rejected even an Iqbal standard to apply there, even less than an Iqbal standard, and the government would never be able to introduce evidence on a motion to dismiss under Iqbal, for instance, under a 12B6 motion, yet it wants to incorporate all sorts of evidence in this situation. The last thing I would say is on the nexus. We put it in our reply brief this way. What these underlying claims against the judges are that the judges have construed the three strikes rule too constrictively and out of sync with the statutory text, which in turn artificially ends his lawsuits, which in turn leaves unchecked and emboldened DOP officials who continuously keep him in physical danger due to his placement in the town book and leaving his block home untreated. One thing leads to another, and there would be nexuses in this case. The final point, if I can squeeze it in, is that the government wants to say it's treated the block home and therefore the block home wasn't in imminent danger, but at the time what they do is introduce facts where they treated the block home after he filed his notices of appeal, and the only thing that matters, and Gorka disputes that anyway, that the treatment wasn't in any manner sufficient, but what matters is that it was untreated and he was in imminent danger of blindness at the time of the filing of the notices of appeal. Mr. Shelley, you were appointed by the court to serve as an advocate for both of these cases. You've been extremely helpful to us, and we are grateful to you for your work. Thank you, Brian. Please call the next case. Case number 19-5362. Ahmed Ali Moussana, individually and as an ex-friend of Claudio Moussana and minor Joe Doe, initials A.M., the felon, versus Michael R. Ponteo in his official capacity as Secretary of the Department of State at all. Ms. Jones, for the felon, and Mr. Seward, for the appellee. Good morning, Ms. Jones. You may proceed. Good morning, and thank you, Your Honor. You may please record. You know, I did try to get Mr. Shelley to cover this one for me as well, but apparently he was at his limit for the morning. This case centers on the difference between the ability to administratively revoke a document versus revocation of citizenship status itself. And as the Supreme Court held in Trapp v. Dulles, neither the Congress nor the executive, nor the judiciary, nor all three in concert, may strip away birthright citizenship without the due process as guaranteed under the Constitution. That was true in the Supreme Court held so in 1958, and it remains just as true today. There's no dispute here that Hoda Moussana was born after her father stopped working as a diplomat. But before the notice was received, right? That is actually in dispute, Your Honor. Isn't it the record before us that she was born between the end of her duty and the time of the notice? Your Honor, there has been some documentation presented at the district court by the government showing that the blue list was dated February after her birth, a couple of months after her birth, recognizing the notification. It only has before us that it's been a finding that her birth was between those critical dates, right? There's been a finding that her birth was after his duties ended. And before the notice was sent, right? We don't know that it was before the notice was sent, Your Honor. Isn't there a finding to that effect by the district court? That is the district court that did defer to the government's holding on that, or the government's representation on that. But it's actually a yes to my question, right? As to the district court's decision, yes. We did ask for a discovery on that issue because we don't believe that it was established in the dispute, but that was the holding of the district court. We would say, however, though, that if you look at the language of Article 43 of the DNIA Convention, it is not as clear that notification is the only measure of when the end of diplomatic status is triggered. Article 43 contains the term inter alia, as far as when the function of diplomatic agent comes to an end, right before listing notification being received by the host state. And as we've set forth in our briefs, the documentation behind me at that time was to intentionally leave it open and leave it vague. It is not restricted. It is extensive. And it is inter alia, among other things. The government has argued in other cases and in other situations that diplomatic immunity ends when the duty's ended. And there is no dispute that the duty's ended prior to Ms. McDonough's birth year. I want to ask you, assuming we all think that this turns on notification and nothing else, in your brief, one of the documents in support of the Donovan Declaration was this U.N. termination list. Yes, sir. And you raised some concerns about that. Correct, sir. It contains a bunch of incomprehensible handwritten notes. Correct. But the date is February 5th. And so I don't see there's any inconsistency between that and the Donovan Declaration. You know, what I would say to that is that, first of all, there is a date entered as of February 2005, but we are not clear if that's the first time that notations were entered, if that's the first time that there is an entry. We know that February 2005 is the date of the God's location. It's February 5th. Now, there's other documents, which I'll get to in a minute, but I don't understand why this document is inconsistent with what's on this document. Yeah, I believe that the inconsistency that we point to here is with the October 18th, 2004, letter from the Minister of Council for Host Country Affairs at the first time that the Department of State was looking at Ms. Donovan's application for a task force. That's why I asked you the question. So what's the case really termed for? Let me see if I got this right. Whether there's an inconsistency between the earlier letter, the one by Graham, and the Donovan one. That's the question. That is part of the question, Your Honor, but both of those go to revoking the document of the passport, and the government's right to revoke this document of the passport, not to whether the Department of State has a right to revoke her citizenship status. The Department of State has a right to revoke her citizenship. All it says is that, as far as I understand it, the Department's view is that she never had citizenship, and therefore revoked the passport. Your Honor, she had an issue. I would guess she revoked her passport, but I don't see that. I mean, her citizenship. I just see this as revoking the passport because she was out of business. Is that wrong? Your Honor, as to revoking the passport, the document itself, that in itself would be within the Department of State's discretion to do administratively. The district court's holding specifically states that Ms. Madonna was not born a U.S. citizen, and she had been previously issued two U.S. passports. She had been previously recognized by the Department of State as a United States citizen, and the district court's holding specifically says that, well, no, she's not anymore now. That doesn't really answer the question. Your Honor, under 22 U.S.C. 2705, a passport has the same force and effect as proof of citizenship, as do certificates of naturalization or citizenship issued by the Attorney General. That's not the same question. That's not the same question. An incorrectly issued certificate or an incorrectly issued passport can't confer citizenship. It may be evidence or proof, if you use the word, of citizenship, but that doesn't confer the citizenship. If it's found to be erroneously issued, the administrative stuff isn't from denying the person was a citizen in the first place. Your Honor, I would say that the government is not exempt from revoking, again, the documents, but once the citizenship has been recognized, the government does not. Has been recognized by some functionary at the field level, but there's no case that says that government can be stopped from anything by that level of employee. I think the rule is the United States really has not been stopped by the excellent employees. Is that not, am I wrong about that? Your Honor, it wasn't just the fact that this one individual, who is the Minister of Counsel for House Country Affairs, issued a letter. It's the fact that the Department of State itself, as a department issued, as the department which is charged with this responsibility, issued two passports and is now recognizing her as a United States citizen. Yes, but incorrectly, according to the government's position, recognizing. And once again, it's revoking the document because it was incorrectly issued. That is the current argument that they're making, Your Honor. And I would say that the court is not required to defer to that because that would not allow it. I'm just asking if the government can't do that. What would keep them from saying this was improperly issued? She's not a citizen, is she? I would say, Your Honor, under the authority of DOD Tillerson and the authority of the study within that holding, that the government needs to be put to its proof to show that she's not a citizen if it's not changing its mind as to what had happened previously when she was issued two U.S. passports recognizing her as a United States citizen. And the government has not yet been put to its proof. This was a grant of a motion to dismiss which was converted to a summary judgment with no discovery that was allowed to occur and no new information that came to light to the government that it did not have in late 2004 and early 2005 when it first issued her U.S. passport and renewed it in 2014. Can I perhaps follow up on Josephine's question in a different way? Because if we assume we agree with the government that Ms. Lozano was not a citizen at the time of her birth, I know you're arguing against that, but assume that for a moment. So is your position that even if she were not a citizen at birth, that she would somehow now have a citizenship status through the recognition of citizenship by the executive branch in her passport? And I guess if that's your view, I mean, do you have any support for that proposition? Are there any cases suggesting that the executive branch can confer citizenship on a person who doesn't have it under the Constitution or the Statute of the United States? Your Honor, in response to that, I would say that if we compare the cases of the Hazan case and the Magnuson case, in the Hazan case there was no dispute that the individual never should have been granted citizenship. He never had the legal right to citizenship to begin with. And the law was incorrectly applied at the time that the first passport was granted. There was no dispute in that case that those were the facts. The individual argued that he should be able to keep his citizenship anyway because once the government had granted that, the government was not allowed to change its mind. That is not what we're arguing here. What we're arguing here is more in line with the Magnuson case. And if you look at that, there simply cannot be just a second look because they decided to take a second look and change their mind. And the government has not been put to its print on that. I think you're fighting that as well. If we assume she was not a citizen at birth, could she have acquired citizenship by the executive branch given her past? Your Honor, she could have acquired citizenship if she was not a citizenship as of the date of her birth. She would have been able to acquire citizenship in multiple other ways, but she did not because she relied on the representation and the grant and the official document from the Department of State that she was a United States citizen. As with Mr. Mazzano's older children, he would have gone through the process of getting them lawful permanent resident status and then they became citizens later. And when Mr. Mazzano himself was later naturalized, while Ms. Mazzano was still a minor, she would have been eligible for citizenship at that point as well. She didn't pursue any of those avenues because during all of those times, she was recognized as a United States citizen. So would you think her reliance interest creates a right by the executive branch to confer citizenship on her or by the district court or by a court to confer citizenship on her? We're not asking the district court to confer citizenship on her or the Department of State to confer citizenship on her. What we're asking is that the status quo where she had citizenship that has been recognized be maintained until the government is put to its proof to establish otherwise other than through a motion to dismiss with review of other documents, which is what has happened here. There has not been the appropriate due process to show that it was erroneously issued and should be revoked. That has not happened or rescinded. But that has not happened. That due process has not been afforded to Ms. Mazzano thus far under the facts of this case and at the status of where we are at which point the district court granted just and ruled her not to be a citizen as of the time of birth. That discretion is not within the district court and it's not within the Department of State to remove the citizenship status. They can revoke the document. Section 1504, which the government has relied on, gives the government the authority to revoke a passport document if it determines for whatever reason that the document was erroneously issued. But it does not. Nothing in there grants the government any authority or, for that matter, the courts any authority to revoke the citizenship status. That is something that is just simply not up to those agencies to do and that is what's happened here is that her status has been revoked through the holding of the district court. If you look at 8 U.S.C. 1504A, the sentence at the end of that is that the cancellation under the section of any document purporting to show the citizenship status of the person to whom it was issued shall affect only the document and not the citizenship status of the person in whom the document was issued. And that is the statute which specifically refers to the Secretary of State's right to revoke a document that it subsequently believes was erroneously obtained or illegally or fraudulently obtained. It still does not give the right to revoke the status of the citizenship, just the document. Unless my colleagues have any further questions. Thank you. Judge Ryan, were you finished? I think I'm finished. Okay, we're good. Thank you, Your Honor. Your Honor, may it please the court, I'm Scott Stewart on behalf of the United States. In this case, the district court granted summary judgment to the government on the plaintiff's many claims that rested on the assertion that his daughter is a United States citizen. The court concluded, under the governing law and the conclusive evidence submitted by the government, that the plaintiff is not a United States citizen. The district court also refused to provide the plaintiff with an advisory opinion regarding hypothetical actions that he may take that implicate federal criminal law. The district court was correct to rule for the government. This court should affirm. I'll leave, of course, with the main and central issue in this appeal, Your Honor, regarding the plaintiff's diplomatic status and therefore the citizenship status of his daughter. As we've explained, this case is over-determined in a number of ways. The Vienna Convention sets forth the governing principles quite clearly. The Department of State has reasonably construed those principles in accordance with that language. And the Department of State has, in turn, provided a conclusive certification regarding the dispositive citizenship issue, regarding the dispositive diplomatic immunity issue that decides the citizenship question, Your Honors. In short, the analysis goes like this. Under the plain language of the Vienna Convention, the functions of a diplomat end on official notification to the receiving state. When functions end, that's under Article 43, when those functions end, then immunity ceases when a person leaves the country or after a reasonable time to do so. And usually that can go a reasonable period of 30 days beyond unless the person's already been afforded a reasonable period. That's how the Department of State has interpreted it here. Consistent with that interpretation, Mr. Donovan submitted a certification setting forth the conclusive dates on which the plaintiff possessed diplomatic status that went through early February 1995 after Ms. Muthana's birth. Under long-standing Supreme Court law, law applied by other circuits more recently, that is conclusive, that decides the question. And as we've also explained, Your Honor, and as I think some of Your Honor's questions pointed out, the underlying contemporaneous documents also bear that out. The Cardex card makes clear that Ms. Muthana was added to her father's diplomatic Cardex card. As Mr. Donovan explained, the only reason to do that would be if Mr. Muthana still retained diplomatic status at the time of her birth. That's why you add another member of the household and make clear that that person also employed diplomatic status. And given that certification, which again is based on a reasonable interpretation of the end of convention here, Your Honors, that certification is conclusive. The other courts have done similarly. Most recently cases like Al-Hamdi in the Fourth Circuit. Abdul Aziz in the Eleventh Circuit have noted the importance of certification. But I'd also just note there's a very, very long pedigree for this sort of treatment of a State Department certification, Your Honor. A leading case noting the importance of this is the Supreme Court's decision in Inrei Baez. This is a late 19th century decision. And the court there noted he was assessing the diplomatic status of someone and that that person's amenability to suit. It looked at Secretary of State certifications going back, I believe, to Secretary of State Madison. So the pedigree is quite longstanding. And the Supreme Court emphasized there, Your Honor, that the Department of State had not provided a certification attesting to the putative diplomat status in that case. And he noted that that was quite important because in the end of his opinion he said, look, when a court gets that certification, it's entitled to accept that. It doesn't need to hear collateral proof. And these certifications just have a conclusive, decisive pedigree in the law when based on a reasonable interpretation as the one here is, Your Honor. But as we've explained, they also are corroborated by the relevant documents. If I can just note a few points, and I think, Your Honor, Your Honor's already highlighted a number of the responses here in the prior colloquy with my friend. The plaintiff here really did not create any plausible dispute. First of all, as noted, the certification is conclusive. But the plaintiff had a number of assertions that were just kind of hollow and said, look, we don't know about what we've said on the blue list. But as I believe Judge Santel or, my apologies, Judge Cato pointed out, that document itself has a February 1995 date on it, the Cardex document, the Thomas record, all underscore that the critical date here, the date of official notification, is undisputed. Let me, I'm sorry to interrupt. I just want to call your attention. I agree with virtually everything that's been said here. There's just one thing that came to trouble here. Yes, Your Honor. And I want to ask you about it. That's the 2004 grant letter. Which is on official stationery as compared to the United States. And it has a different date. And my question is, my bottom line question is, the question of, we all agree, well I agree with you in terms of notification. Notification is a question of facts. Here we have two documents with two different notification dates. Now, you say that, say in your brief that it speaks only of the date of appointment. But it doesn't say that he was employed between those dates. It says he was notified to the U.S. mission during this period. And that's a technical term under the Convention. And in fact, the phrase is virtually identical to paragraph 39. Which says, if someone's already in the territory from the moment his appointment is notified. So it just looks to me like we've got two competing letters here. Both from the same office. Both on the same letter. Different people. One has a December date. One has a February date. In fact, it's the classic. I can address some of your questions on that. Particularly since. Sure, Your Honor. So, we don't know what purpose this grand letter was prepared for. It does not squarely address Ms. Muthana. It doesn't address. No, it doesn't address the question in this case. I respect. That's the question, isn't it? You agree with me, right? I think official. I'm sorry, Your Honor. It's the date of notification. That's the whole question. He said, if notification was in February, you would, because she was born while he was disabled. So it all turns on notification. And what we have here is two competing pieces of evidence. It's very strange. We have to at this stage, you know, get the benefit of the doubt. How can we. I think somebody doesn't. Because there are a couple reasons, Your Honor. Most centrally, I take your point about the mention of notification. But it doesn't. It does not address the question of notification of termination. It says that the person was notified for that, those stretch of dates. You don't have to put it in the Geneva Convention. The Geneva Convention just said, I just read it to you. It just said, or already in the territory, from the moment of appointment, he was notified to the Ministry of Foreign Affairs. That's all. It doesn't have to say termination. It says notified. That's exactly the language from the Geneva Convention. And it said that during this period of time, he was recognized by the department as entitled to hold their bottom unit during that period of time. Correct. Which suggests that it wasn't actually. I'm not saying you're wrong. I just don't understand how you can grant summary judgment. Sure, Your Honor. I think I've got a couple. Understood on your concerns, Your Honor. Let me see if I can answer those directly. The thing that I would notice, there is a difference between notice of appointment and arrival on the one hand and notification of final departure or termination of the functions. Article 10-1A of the Vienna Convention emphasizes those as different things. You need notification of all pieces, or there's a requirement for notification of all pieces. So there is a question. The Donovan certification does address official notification of termination. The grant letter does not address that piece, Your Honor. It speaks only to this other period. It doesn't squarely speak to what happened after that period. For all we know, he was just... Let me interrupt you. The letter, the other letter, doesn't say anything more either. Mr. Donovan's certification, Your Honor. These are identical letters. They're not, Your Honor. The Donovan letter squarely says, and this is on page 18 of the joint appendix, on February 6, 1995, that the United Nations provided the U.S. mission with official notification of Mr. Muthana's termination from the Yemeni mission. It also notes the notification of when he had been terminated, September of 1994, and then it says that Mr. Muthana and his family enjoyed diplomatic immunity until February 6, 1995. So it addresses the different things. I still don't see why that's necessarily on a page of the grant letter. Your letter, the one you're relying on, the February letter, provides more information, but on the technical question of notification, there isn't. Your Honor, it's not that there's not any consistency here. It's that the Donovan declaration is... There's not inconsistency on any relevant question. The Donovan issue speaks more comprehensively to the breadth of issues presented to this court. The grant letter is clipped and addresses only part of the features regarding Mr. Muthana's termination, the notification, and his status. The Donovan certification is across the board of this is when official notification happened, this is when he had diplomatic immunity, and this is when it ended. The grant letter doesn't purport to speak to those things. This is why there's not a dispute, Your Honor. I take Your Honor's point about what the grant letter says. I'm just looking at it right now. According to the information provided to us officially by the United Nations, our records indicate that the plaintiff was notified by the United States Commission as a diplomatic member from this period of time. It seems to me that the Geneva Convention is due to properly interpret it as required. And, yes, the later letter, the Donovan letter, has more information, but on the technical question of notification. We have one that says he was notified from this period of time in December, and we have another letter that says he was notified from this period of time in December. Again, I think, Your Honor, it could look like a different case if one letter said, you know, I'm not suggesting that this would change under the law, but I'm saying what we don't have here. We don't have a grant letter that says Mr. Muthana and his family enjoyed diplomatic immunity until September 1, 1994, and no longer thereafter. Well, but that's perfectly clear. I mean, it says during this period of time he was recognized. That's not inconsistently saying he wasn't recognized. It's not inconsistently, Your Honor, but it also doesn't answer that question, and we do have a certification that does answer that question. And as I've tried to emphasize, Your Honor, I think under Baez and these certifications have a special status here, and we have this Donovan certification that squarely speaks to that dispositive issue of what the status was after that September 1 date when Ms. Muthana was born, and later when Mr. Muthana was himself ceased to have possessive immunity. So I think the critical point is, Your Honor, is that there's no conflict between the documents. It's on the relevant question. The Donovan certification just speaks conclusively to an issue that the grant  And I take your point, Your Honor. Oh, yes. Could I ask you a question about standing, about the next friend standing, which the government challenged below, but did not raise again here on appeal, but obviously we have an independent duty to assess jurisdiction. If we were to determine that Mr. Muthana did not have next friend standing for his daughter, because she's not clearly covered by Rule 17, and the factors in Whitmore, could we find that there was next friend standing for Mr. Muthana's grandson, John Doe? I think. And would that allow us to reach the citizenship question of his mother? Good question, Your Honor. I'm trying to see as to whether we squarely address that. I think potentially the issue, Your Honor, there is that, I can't recall, this case is preceded essentially with John Doe is somewhat of a derivative of status of Ms. Muthana, and I'm trying to recall the allegations of standing and whether any have been made on behalf of John Doe. I think it's really focused on Ms. Muthana, so I don't have a, I may need to think about that a little bit more, Your Honor. I'm not certain of that. I do think that's an important question, whether the next friend standing question could be separated as to Ms. Muthana and her son. Right, Your Honor. My apologies for not recalling it. It's possible that that was addressed at some point. I'm just not summoning it to mind, but I can look at it. It would be useful to the court. We could submit something off the point. Yeah, I would be interested to know the government's position on that question. Very good, Your Honor. Is it your position, though, that, I mean, why is the government not questioning the standing issue at scale? I guess I'm interested in why that argument was put aside. Right, Your Honor. I suppose that what I'll say is that we still think that we are right, that there is a lack, that the district court could have appropriately granted dismissal for lack of next friend standing for each of the reasons we set forth in the district court. As is often the case, we have not pressed that issue here. We could also address that, too, but I do think the reasons we gave, lack of adequate explanation, and the fact that Ms. Muthana seems to have access to Western media, gives interviews, that kind of thing, doesn't suggest that she's truly inaccessible and unable to proceed in her own name. There's some question about harmony of interest. So those are questions. I don't know that I can say much more on why we haven't pressed those in defense of the judgment below. Standing is more readily available for the grandson, given that he is a minor, and it would be within Rule 17, practically. Got it, Your Honor. We can Any further questions? No questions. Ms. Chopp, you used up all your time, but we'll give you two minutes. Thank you, Your Honor. I appreciate that. I would like to begin first by referring to the October 2004 letter. We do know the purpose of that because at this stage we take Mr. Muthana's allegations as true, and his affidavit states that he requested that letter in response to the Department of State asking him about the status of his diplomatic community at the time of Ms. Muthana's birth because he had applied for a passport for her. So because this was a motion to dismiss, which was then converted, at this stage we take his allegations as true on that fact. So we know exactly why this letter came to be. It was when he requested a letter  in response to the Department of State asking him about the status as of the time of her birth. I would also say, as I didn't mention earlier, we do have the claim on behalf of Mr. Muthana directly, where he has specifically said to the FBI that he wants to be able to provide food and clothing for his daughter and for his grandson, and he was specifically told by the FBI that if he does that, if he provides those specific items to these specific individuals in their current situation, that he will be committing, he'll be in violation of 2339B and he will be charged with material support of terrorism for doing that. So this is not an advisory or hypothetical opinion. Finally, as to Justice Rao's question regarding standing, again, not surprisingly we agree with the District Court on a minor child issue, but I would say we do assert in our complaint that standing exists as to the minor child as well, and that requires examining the citizenship of his mother since his citizenship would come from his mother's citizenship. If there is to be additional briefing on that, we don't believe it's necessary, but if there is to be any additional briefing on that subject, we would like the opportunity to do so as well. Any further questions for Judge Rao? No, I mean, it's your position that if we have standing over John Doe, we would be able to reach the citizenship question of Mrs. Thomas. Yes, that is fine. Okay. Ms. Thomas, thank you very much. Thank you, Your Honor. Honorable Court is now adjourned until Tuesday, June 2nd at 930 a.m. All participants are now in interactive talk mode. We're sorry, your conference is ending now. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Tatel, Rao, Sentelle